UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

QUINTON JAMAL DANIELS #657826,

        Plaintiff,

v.

ERICA HUSS,

        Defendant.

_____/

Case No. 2:20-cv-00235

Hon. Hala Y. Jarbou
U.S. District Judge

## **REPORT AND RECOMMENDATION**

**I. Introduction**

This Report and Recommendation (R&R) addresses the summary judgment motion filed by the Defendant in this case – Marquette Branch Prison (MBP) Warden Erica Huss. (ECF No. 44.)

Plaintiff – State prisoner Quinton Jamal Daniels – filed an unverified complaint on November 25, 2020. (ECF No. 1.) Daniels alleged that he was infected with the COVID-19 virus in October 2020 due to Warden Huss's negligent handling of COVID-19 within MBP. This Court has also construed Daniels's factual allegations as an Eighth Amendment deliberate indifference claim against Warden Huss. (ECF No. 27, PageID.157.)

Daniels sues Warden Huss in her official and personal capacities. (ECF No. 1, PageID.2.) In his complaint, Daniels stated that he sought monetary damages. Later, during his deposition, Daniels indicated that he wanted the Court to order the

enforcement of various COVID-19 mitigation and control measures, such as social-distancing, masking, and quarantining. (ECF No. 45-2, PageID.268-69.)

Warden Huss seeks summary judgment and dismissal of this case, arguing (1) that the evidence in the record demonstrates that she responded reasonably to the COVID-19 pandemic, (2) that Daniels's request for injunctive relief is moot in light of his refusal to accept a COVID-19 vaccine, (3) that she is entitled to qualified immunity, and (4) that Daniels's official capacity claims for money damages are barred by the doctrine of sovereign immunity.

Before the Court are two competing narratives regarding events that took place in the Marquette Branch prison in September and October 2020. Warden Huss's account is notably detailed and extensive. (ECF No. 45-3.) Daniels's account is set forth in his verified response[1] to Warden Huss's motion for summary judgment. (ECF No. 58.) He outlined various MDOC policies and a Director's Office Memorandum (DOM) (specifically, DOM 2020-30R6) that required MDOC employees to enforce COVID-19 mitigation and control measures. Daniels notes that this DOM was sent directly to MDOC Wardens. Daniels asserts that he and other prisoners at MBP were exposed to COVID-19 during the fall of 2020 after some COVID-positive

---

[1] The materials a court may consider in making this assessment are identified in Fed. R. Civ. P. 56(c). Courts will allow a plaintiff to rely on a "verified complaint," when responding to a motion for summary judgment. *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). Daniels's response also includes a verification that appears to meet the requirements of 28 U.S.C. § 1746. (ECF No. 58, PageID.489.) Accordingly, the undersigned will view the factual statements in his response as verified. Thus, the undersigned will treat these statements as a declaration meeting the requirements of Fed. R. Civ. P. 56(c).

prisoners were transferred in from another prison and were allowed to mingle with the prison population. He says that porters and grounds workers continued to circulate in the prison population even as the COVID-19 virus was spreading in the prison population. And he says that the failure to enforce quarantine measures is directly attributable to Warden Huss.

In the opinion of the undersigned, Daniels's factual assertions in his verified response are sufficient to create a genuine issue of material fact as to his deliberate indifference claim against Warden Huss. Accordingly, the undersigned respectfully recommends that the Court deny Warden Huss's motion for summary judgment. However, the undersigned recommends dismissal of Daniels's claims against Huss in her official capacity.

## II. Factual Allegations

Daniels's unverified complaint alleges that Warden Huss "knew about Covid-19 before the outbreak at Marquette Branch Prison." (ECF No. 1, PageID.3.) Daniels says that he received a positive COVID-19 test on October 13, 2020. (*Id.*) Daniels alleges that Warden Huss was negligent by never removing or quarantining prisoners with positive tests. (*Id.*) Warden Huss allegedly also knew that some staff were exposed to COVID-19, but she did not care. (*Id.*) Daniels says that Warden Huss "told me one thing then did something totally different because of her lies and by it being an open bar setting the prisoners that [were] positive spread[] it [because] . . . COVID-19 [is] airborne . . . ." (*Id.*)

3

Daniels alleges that he had COVID-19 for two weeks and experienced weakness and tiredness, coughing, congestion, a bloody nose, and body aches. (*Id.*) Daniels says that he gets nervous when he sees or hears someone who sneezes, coughs, or has a runny nose. (*Id.*)

Daniels's verified response to Warden Huss's motion for summary judgment (ECF No. 58) states that DOM 2020-30R6 went into effect on August 27, 2020. (*Id.*, PageID.483.) Daniels included a copy of this DOM with his response. (ECF No. 58-2.) Daniels alleges that about 120 prisoners were transferred from Kinross to MBP at the end of September 2020. (ECF No. 58, PageID.484.) He says that two of these prisoners had COVID-19. (*Id.*) These prisoners were housed in C Unit but taken to D Unit for showers, where they allegedly had contact with others in the general population yard. (*Id.*) By the end of September 2020, two prisoners in G Unit, where Daniels was incarcerated, came down with COVID-19. (*Id.*, PageID.482-83, 485.) Daniels identified their cells and stated that these COVID-19 positive prisoners stayed in their cells rather than quarantining for two days. (*Id.*, PageID.485.) MBP finally locked down due to a widespread COVID-19 outbreak on October 5, 2020. (*Id.*) Daniels also noted that kitchen porters, grounds workers and unit porters continued to circulate even after the lock-down. (*Id.*) Daniels asserts that Warden Huss refused to enforce the relevant DOM until after this outbreak. (*Id.*) In his complaint, Daniels says he learned he was positive for COVID on October 13, 2020. (ECF No. 1, PageID.3.)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV. Eighth Amendment

Daniels alleged in his complaint that Warden Huss violated his rights because she knew about Covid-19 before MBP had an outbreak in October of 2020, but failed to quarantine prisoners with COVID-19 positive tests or those who were exposed to the virus. Daniels says that he contracted COVID-19 during MBP's October 2020 outbreak and had symptoms for two weeks. Daniels says that he now gets nervous when another person coughs, sneezes, or has a runny nose.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the

6

objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Defendant cites to a Sixth Circuit case from 2020 – *Wilson v. Williams*, 961 F.3d 829 – in support of the proposition that the reasonableness of Warden Huss's response to COVID-19 is the key inquiry here. (ECF No. 45, PageID.210-11 (citing Wilson, 961 F.3d at 840-41).) The *Wilson* case arose out of a denial of a motion for a preliminary injunction filed by federal prisoners. 961 F.3d at 835. The Sixth Circuit recognized that other Sixth Circuit decisions held that responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, were reasonable. *Id.* at 841. It is important to note the ruling in *Wilson* was made in the context of considering the prisoners' likelihood of success on the merits of their Eighth Amendment claim. *Id.* (noting "[w]e conclude that petitioners are unlikely

7

to succeed on the merits of their Eighth Amendment claim because, as of April 22, the BOP responded reasonably to the known, serious risks posed by COVID-19 to petitioners at Elkton"). Thus, the analysis in *Wilson*, although useful context, is not based on the same procedural question. Here, the Court must consider whether a genuine issue of material fact exists. Fed. R. Civ. P. 56.

Counsel for Defendant provides the Court with a number of different documents outlining the MDOC's response to COVID-19, and the specific steps taken at MBP. (ECF Nos. 45-2 to 45-12.) The centerpiece of the defense is Warden Huss's affidavit describing the steps taken at MBP. (ECF No. 45-3 (affidavit of Warden Huss).) As an initial matter, Warden Huss denies that she failed to take all necessary steps to contain COVID-19 at MBP. (*Id.*, PageID.301 (¶6).)

Warden Huss's affidavit then offers an extended and detailed explanation of the steps she took, the highlights of which will be summarized below. As noted above, Daniels was housed in G Unit at MBP during the relevant period. (*Id.*, PageID.302.) As a Security Level V inmate, Daniels was at the highest security level, and he was housed alone in single cell. (*Id.*, PageID.301-302.)

Warden Huss attests that she followed all MDOC COVID-19 procedures and took precautions and measures to protect against the spread of COVID-19 at MBP, including compliance with all Director's Office Memoranda.[2] (*Id.*, PageID.301.)

---

[2] In addition, this included having staff and prisoners tested weekly for COVID-19, screening for COVID-19 symptoms and temperature checks for staff, with staff who were experiencing symptoms or who received positive test results ordered not to return to work. (ECF No. 45-3, PageID.307) Social distancing and mask wearing was enforced through inmate and staff disciplinary procedures, with multiple

8

Initially, Warden Huss established Q Unit, with 12 single cells, and the vacant C Unit, with 103 single cells, as isolation cells for COVID-19 positive prisoners. (*Id.*, PageID.303.)

Warden Huss notes that the first known positive COVID-19 case at MBP occurred on August 26, 2020, when a newly committed prisoner was transferred from a county jail and received a positive test at MBP. (*Id.*, PageID.304.) That prisoner was immediately housed in Q Unit in a single cell from the time he arrived at MBP. (*Id.*) As soon as the positive test was received, Personal Protection Equipment (PPE) requirements and a quarantine notice were placed on entrances to Q Unit and PPE stations were established in the corridor of Q Unit. (*Id.*) Access to Q Unit was restricted. (*Id.*) All close contacts with the prisoner, which included prisoners and staff, were tested and the results came back negative. (*Id.*)

On September 8, 2020, an employee was sent home before entering the facility after a screening COVID-19 test returned a positive test. (*Id.*) Contact tracing was conducted and two staff members were ordered to quarantine and not report to work. (*Id.*) Contract tracing found that no prisoners had been exposed to that employee. (*Id.*) Due to this positive result, weekly mass testing of employees began. (*Id.*)

Warden Huss confirms Daniels's claim that a number of prisoners from another facility were transferred to MBP. She attests that on September 14, 2020,

---

employees referred to MDOC Internal Affairs for failing to wear masks, and at least one employee was suspended. (*Id.*, PageID.308.) Soap, masks, and cleaning supplies were provided to staff and inmates. (*Id.*) Prisoners were notified of program closures and about social distancing, masking requirements, and proper hygiene in postings throughout the facility and via the J-Pay email system. (*Id.*)

103 prisoners were transferred into MBP from Chippewa Correctional Facility (URF) immediately following a prison disturbance which involving the destruction of property that caused the prisoners' housing unit to be uninhabitable. (*Id.*, PageID.305.) MBP was forced to house these prisoners in C Unit – the only available space at MBP that could house 103 prisoners. (*Id.*) Unfortunately, C Unit is a general population unit that does not have separate enclosed shower stalls. (*Id.*) C Unit prisoners needed to be escorted to D Unit for showering because showering in an open group setting would cause security concerns. (*Id.*) D Unit showers were sanitized after each use and C Unit prisoners were never mixed with D Unit prisoners. (*Id.*)

MBP conducted mass COVID-19 testing of all prisoners and staff on September 14 and 17, 2020. (*Id.*) All prisoners tested negative. (*Id.*) On September 19, 2020, a second employee returned a positive test, and two employees were determined to be close contacts. No prisoners were close contacts. (*Id.*) The employees were ordered not to return to work. (*Id.*) On September 25, 2020, a third employee tested positive after mass testing was conducted on September 21, 2020. (*Id.*, PageID.306.) One close contact employee was identified and both employees were ordered to quarantine at home. (*Id.*) After mass testing was conducted on September 24, 2020, a fourth and a fifth employee tested positive and six close contacts were identified. (*Id.*) All were ordered not to return to work. (*Id.*)

On September 30, 2020, a prisoner who was experiencing COVID-19 symptoms was identified from C Unit and moved to quarantine in Q Unit. (*Id.*) The prisoner

was tested on October 1, 2020, and on October 3, 2020, the result was returned as positive. (*Id.*) That prisoner was transferred to the Duane Waters Health Center. (*Id.*)

Prisoners in Daniels's housing unit began testing positive in early October 2020. (*Id.*) Six prisoners returned positive results between October 5 and October 7. (*Id.*) All six prisoners were moved to quarantine in the Q Unit. (*Id.*)

On October 7, 2020, MDOC's Bureau of Health Care Services declared that MBP was in "outbreak status." (*Id.*) A rapid increase in the number of prisoners testing positive occurred. (*Id.*) There were at least twenty new positive prisoner cases each day between October 8 and 11. (*Id.*) With over 83 COVID-19 positive prisoners by October 12, 2020, Q Unit was full. (*Id.*, PageID.306-307.) C Unit was full due to the transfer of 103 prisoners from URF. (*Id.*) All available beds at other COVID-19 units in other MDOC facilities were full of positive COVID-19 prisoners. (*Id.*, PageID.307.)

According to Warden Huss, the only option available at MBP was to isolate COVID-19-positive Level V prisoners in their single cells. (*Id.*) Daniels alleges that he was positive for COVID-19 on October 13, 2020, and he says that he was not quarantined. Daniels was in a single Level V cell and, like all COVID-19 Level V prisoners, Daniels was quarantined in his own cell. (*Id.*) That was the only available option at that time because the quarantine unit was full of COVID-19 positive prisoners. (*Id.*) Notices were posted on each prisoner's cell who tested

positive, as well as outside the Unit, notifying staff that they were required to wear PPE before entering the area.[3] (*Id.*)

In summary, Warden Huss sets forth a detailed account of COVID control measures she undertook at MBP. "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' . . ., a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 844–45 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and *Spain v. Procunier,* 600 F.2d 189, 193 (CA9 1979) (other citations omitted)). If Warden Huss's account were the only narrative before the Court, the undersigned would certainly agree that she has established that she acted reasonably to mitigate and control the spread of COVID-19.

But, as noted above, Warden Huss's account is not the only account before the Court. The undersigned will also consider Plaintiff Daniels's verified response to the motion for summary judgment. (ECF No. 58.) Daniels offers a far less detailed account of the evolution and spread of COVID-19 at MBP in late September and early October 2020. (*Id.*, PageID.483-86.) His account does match Warden Huss's in several regards. Both agree that prisoners from another institution were brought to

---

[3] Once the vaccine was available, all prisoners in MDOC prisons were provided with the opportunity to be vaccinated against COVID-19. Daniels refused to be vaccinated due to concerns about the ingredients in the vaccine. (ECF No. 45-2, PageID.256, 258 (Daniels's deposition testimony).) Daniels believes that the vaccine provided by the prison is "a way for y'all to try to kill me." (*Id.*, PageID.259, 260.) Daniels believes that Warden Huss and prison health care is trying to kill him with the vaccine. (*Id.*, PageID.260.) He equates the vaccine offered at the prison with "Russian roulette" and explains that he believes that some prisoners will survive it, but he is afraid that he will not. (*Id.*, PageID.262.)

MBP in September. And both agree that these prisoners went to D Unit to shower. And, obviously, both agree that COVID spread rapidly through the prison during that time. Daniels's account differs, however, on the extent to which MBP staff complied with the applicable DOM. He says the staff did not comply and, as a result, the virus spread through the prison. (*Id.*, PageID.485.) Daniels's version of events is not as detailed as Warden Huss's. But he does identify specific cells in which COVID-positive prisoners were held. (*Id.* (discussing prisoners in G Unit, "Second cell 1" and "First cell 34").) He also notes that prisoners in close proximity to these COVID-positive prisoners were not isolated and that kitchen porters, grounds workers and unit porters continued to circulate in the prison even after the October 5 lock-down went into effect. (*Id.*)

Counsel for Warden Huss also argues that Daniels cannot show that Warden Huss actually "*knew* that staff who reported to work had tested positive for COVID-19." (ECF No. 45, PageID.211-12 (italics in original).) This argument generally raises the issue of supervisory liability. "Supervisors are often one step or more removed from the actual conduct of their subordinates; therefore, the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). But "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

> Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. Instead, the liability must

be based upon active unconstitutional behavior. Liability under this theory must be based upon more than a mere right to control employees and cannot be based upon simple negligence.

*Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989)).

> [A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.1982).

Warden Huss explained her involvement in the implementation of COVID-19-related policies. She stated the following:

> 2. As the Warden, I am involved daily in the implementation of all MDOC policies and directives for preventing the spread of COVID-19 within MBP. Through this role, I have personal knowledge regarding the numerous measures that were swiftly implemented and continued at MBP to minimize and manage the spread of COVID-19.

(ECF No. 45-3, PageID.300.) To her credit, Warden Huss appears to have delivered hands-on leadership during a time of crisis in the prison. Her statement, however, creates a genuine issue of fact regarding her direct involvement in the implementation of the policies and practices about which Daniels complains.

14

In the opinion of the undersigned, the differences between the accounts given by Warden Huss and Plaintiff Daniels are sufficient to create a genuine issue of material fact regarding Daniels's Eighth Amendment deliberate indifference claim.

## V. Eleventh Amendment Immunity

The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

> A suit against a state official in his or her official capacity for damages cannot be maintained pursuant to § 1983 because that official has Eleventh Amendment immunity. This is true because "a suit against a state official in her or his official capacity is not a suit against the official but rather is a suit against the official's office." As such, a suit against a state official in his or her official capacity is no different than a suit against the state.

*Clark v. Chillicothe Corr. Inst.*, No. 2:19-CV-954, 2020 WL 1227224, at *3 (S.D. Ohio Mar. 13, 2020) (citations omitted).

The Sixth Circuit, in interpreting *Will*, has held "that plaintiffs seeking damages under § 1983 [must] set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials. *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989). To the extent that Daniels seeks money damages, costs, and fees from Warden Huss in her official capacity, that part of his lawsuit is barred by sovereign immunity.

"There are three exceptions to a State's sovereign immunity: (a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies; and (c) when Congress has

15

properly abrogated a State's immunity." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). Only the second exception is potentially at issue here. "Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Id.* Daniels's complaint states that he is only seeking money damages. (ECF No. 1.) During his deposition, however, Daniels said he was also seeking injunctive relief. (ECF No. 45-2, PageID.268-69.) Specifically, he said he wanted the Court to order the MDOC to comply with masking, social-distancing and quarantining requirements. (*Id.*) There is nothing in the record to indicate that these requirements are being ignored now or that COVID-19 is widespread at MBP.[4] Thus, Daniels's request for injunctive relief is moot.

Accordingly, if the Court allows Daniels's deliberate indifference claim to go forward, the Court should dismiss his claims against Warden Huss in her official capacity.

## VI. Qualified Immunity

As an alternative argument, Defendant moves for dismissal on qualified immunity grounds. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v.*

---

[4] On the day that Warden Huss signed her affidavit – Dec. 8, 2021 – MBP had four positive cases. (ECF No. 45-3, PageID.301, 308.)

16

*Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017)

17

(internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

Daniels has presented some evidence in the record – specifically, the statements in his verified response to the motion for summary judgment (ECF No. 58) – that establish a genuine of material fact regarding whether Warden Huss violated his rights by being deliberately indifferent to his risk of COVID-19 at MBP. Thus, Warden Huss is not entitled to the defense of qualified immunity.

### VII. Recommendation

In the opinion of the undersigned, Daniels's factual assertions in his verified response are sufficient to create a genuine issue of material fact as to his deliberate indifference claim against Warden Huss. Accordingly, the undersigned respectfully recommends that the Court deny Warden Huss's motion for summary judgment. However, undersigned recommends dismissal of Daniels's claims against Huss in her official capacity for money damages.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: September 1, 2022

/s/ *Maarten Vermaat*
MAARTEN VERMAAT
U.S. MAGISTRATE JUDGE